**In re Michael GOLOWATY (formerly d/b/a Pier One Restaurant), Debtor.**

**Martha M. FREDETTE, Plaintiff,**

**v.**

**Michael GOLOWATY, Defendant.**

**Bankruptcy No. 81–00001.**
**Adv. No. 81–0106.**

United States Bankruptcy Court,
D. Vermont.

Aug. 27, 1981.

John Paul Faignant of Miller, Norton & Cleary, Rutland, Vt., for plaintiff.

Richard L. Hill, Rutland, Vt., for defendant-debtor.

## MEMORANDUM, FINDINGS OF FACT AND CONCLUSIONS

CHARLES J. MARRO, Bankruptcy Judge.

This is an adversary proceeding on the Complaint of the Plaintiff objecting to the discharge of the debtor and to determine the dischargeability of debt.

Although that portion of the Plaintiff's Complaint relating to objection to discharge contains a number of allegations which do not by themselves support grounds for denying the discharge it appears that the Plaintiff is relying on § 727(a)(3) and § 727(a)(4) which provide that a discharge may be denied if the Debtor has falsified or failed to keep adequate financial records, without justification, or has in connection with the case knowingly and fraudulently made a falsehood or account, respectively.

That portion of the Complaint which relates to the dischargeability of the debt is predicated on § 523(a)(2) as being a debt for obtaining services by actual fraud and amended at the hearing to include by false pretenses or false representation.

## FACTS

The Debtor, who was engaged in the operation of Pier One Restaurant situated at the corner of Merchants Row and State Street in the City of Rutland, Vermont, filed a Voluntary Petition for Relief "as a voluntary bankrupt" on January 5, 1981, and he listed the Plaintiff as an unsecured creditor in the sum of $2,485.00. The amount of the indebtedness was taken from the claim of the Plaintiff in a pending action instituted against the Debtor in Vermont State Court.

The Debtor represented himself in the bankruptcy proceeding although he did have the assistance of attorneys with the firm of Abatiell and Abatiell, Esquires, in the preparation of the Petition, Statement of Affairs and Schedules. These were sworn to by him on January 5, 1981 before James S. Abatiell, Notary Public, who is a member of the aforesaid firm. These documents were not examined very carefully by the Debtor before they were executed and filed with the Court.

The Debtor had no experience in the restaurant business before he started this operation. He did employ an accountant who set up a "one write" posting system for the business with monthly financial statements prepared by him. These records were made available to the Plaintiff.

On or about the first of November, 1979, he conferred with the Plaintiff relative to engaging her services as a manager of the restaurant and offered compensation of $300.00 a week. She felt that this was high and they settled on a gross salary of $250.00 a week and a net take-home pay of $200.00.

During the months of November and December, 1979, the Plaintiff did perform certain duties in behalf of the Debtor such as contacting would-be suppliers and preparing for the opening of the business. It was anticipated that the opening would occur sometime in November, 1979, but it was delayed until January 9, 1981. During the months of November and December, 1979, the premises were being readied for the start of business and there were many individuals involved in this activity including the Plaintiff.

After the opening the Plaintiff worked for two weeks at the end of which she was fired by the Debtor. The Plaintiff did work long hours during her period of employment for which she was not voluntarily paid by the Debtor. She registered a complaint with the Vermont Department of Labor and Industry and, during the course of an investigation, the Debtor offered to settle the salary issue for $500.00. This was not accepted and a representative of the Department decided to continue the investigation and at its conclusion the Debtor was ordered to make payment. During the course of the investigation the Plaintiff did receive payment for one and one-half weeks of the last two weeks of employment. The Schedules show that at least seven other employees of the Debtor with total wages of $3,600.00 were not paid.

The Debtor furnished about $20,000.00 capital to start the business. The restaurant premises were leased from Jamac Corporation in which James S. Abatiell, Esquire, is the executive officer. From October, 1979 to October, 1980 the Debtor borrowed about $20,000.00 from this landlord. He also entered into a Lease with Jamac beginning October 1, 1979 with rent payable at the rate of $450.00 a month from October 1, 1979 to October 1, 1980, $550.00 a month from October 1, 1980 to October 1, 1981. The rent increased each year thereafter and the Debtor was obligated to pay one-half of the increase in taxes, make all repairs and alterations, and furnish heat and other utilities. The Debtor was in default under the lease and he scheduled Jamac Corporation as a secured creditor in the sum of $39,-434.27. He also scheduled Abatiell and Abatiell, Esquires, as unsecured creditors in the sum of $19,239.27 for legal services rendered including those performed in a divorce action involving the Debtor and a picket case with the Labor Board.

On December 18, 1979, the Debtor and James Abatiell opened a joint account in the Rutland Savings Bank with two signatures required on checks drawn against the account. The name "Pier One Seafood Restaurant" was shown on the signature card. Checks were drawn against this account and they were signed by both the Debtor and James S. Abatiell, one of which was payable to the Plaintiff, Martha Fredette, in the sum of $63.25 on January 7, 1980, and it carried the notation "reimbursement." James S. Abatiell was somewhat involved in the Debtor's business but in what capacity and to what extent are unclear. He did, however, have meals at the restaurant for which he was charged and they were carried on the debtor's books as an account receivable.

The Debtor failed to list his joint account with James S. Abatiell in the Rutland Savings Bank as well as two other accounts in the Statement of Affairs, one of which was a joint account with his wife with little activity and used mostly for the payment of medical bills. This failure was due to an oversight.

The Debtor's restaurant business was in financial trouble from its inception. In about one year of operation the Debtor ran up obligations, as shown in his Schedules, of $106,247.22, including unpaid withholding, Social Security and Rooms and Meals Taxes of $17,200.00.

The Debtor has made available to the Plaintiff all records in his possession pertaining to the business.

## MEMORANDUM AND CONCLUSIONS

In seeking a denial of a discharge the Plaintiff relies on § 727(a)(3) and (4) under which the Court shall grant the Debtor a discharge unless:

"(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the Debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

"(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;—"

■ This Court is satisfied from the evidence adduced at the hearing that the Debtor did not make a false oath and, therefore, should not be denied a discharge under § 723(a)(4). The Plaintiff contends that the Debtor has concealed or failed to keep or preserve books and records from which his financial condition or business transactions might be ascertained. The requirements for keeping books and records by a debtor are spelled out in the case of *Matter of Underhill,* 82 F.2d 258 (2nd Cir. 1936). In this case the Court said:

"The law is not unqualified in imposing a requirement to keep books or records, and it does not require that if they are kept they shall be kept in any special form of accounts. It is a question in each instance of reasonableness in the particular circumstances—"

■ It is sufficient if the books and records are kept, if required at all, so as to reflect, with a fair degree of accuracy, the debtor's financial condition and in a manner appropriate to his business. He is not under a duty to maintain books in an elaborately scientific and comprehensive form; the "dictates of ordinary fair dealing, or common caution, are taken to supply any inability to tell in advance just what the law will exact". There are cases in which no duty to keep books arises. Whether a failure, total or partial, will be justifiable, is a question of fact to be determined in each instance under the particular circumstances and gauged by the broad test set forth above. Where the debtor's books did not reveal all his business dealings but were "adequate to bring said debtor's business into scrutiny" and the totality of dealings were brought out upon an examination of the books of a creditor whose general business relations to the debtor was revealed by the latter's books, the bankruptcy judge's order denying a discharge was reversed by the District Court. 4 Collier 14th Ed. § 727.03 Pages 727–34 through 727–37. *In re La Belle,* 112 F.Supp. 447 (D.C.Cal.1953).

■ In the instant case the Debtor hired an accountant who set up a "one-write system" to which he had adhered and he did make available all of the records pertaining to the restaurant business which he had in his possession. It is not unusual in the restaurant business that there be some deficiency in the types of records kept. The Debtor had no previous experience in this type of business and it was evident from his testimony which the Court considers credible that he was doing the best he could under the circumstances and that he had no intent to conceal any of the business operations from any of his creditors. As a matter of fact, it appeared that the Plaintiff was attempting to procure records which would establish a partnership between the Debtor and James S. Abatiell, rather than facts which would sustain a denial of discharge.

■ That portion of the Complaint to Determine Dischargeability is predicated on § 523(a)(2)(A) of the Bankruptcy Code which makes nondischargeable any debt for obtaining services by false pretenses, a false representation or actual fraud. The frauds included in § 523(a)(2)(A) of the Code, upon which Plaintiff relies, are those which in fact involve moral turpitude or intentional wrong; fraud implied in law which may exist without imputation of bad faith or immorality is insufficient. 3 Collier 15th Edition 523–39 § 523.08(4).

The Courts, under § 17(a) of the Bankruptcy Act, the forerunner of § 523 under the Code and couched in the same language have uniformly construed that false pretenses or false representations entail frauds which involve moral turpitude or intentional wrong and not those implied in law. *Underwood v. Ajax Rubber Company, Inc.,* 296 S.W. 964, 11 Am.B.R. (N.S.) 488; *In the Matter of Noble,* 42 F.Supp. 684, 48 Am.B.R. (N.S.) 391. See also cases cited under Note 12, 3 Col. 15th Ed. 523–39.

It is clear from the foregoing that the creditor in this case must bring himself within the exception prescribed by § 523(a)(2)(A) of the Code and thereby assumes a heavy burden.

See also 1A Collier's 1634 as follows:

"The frauds included in the portion of clause (2)* under discussion are those which in fact involve moral turpitude or intentional wrong; fraud implied in law, which may exist without imputation of bad faith or immorality, is insufficient.

\* Refers to Sec. 17 of the Bankruptcy Act—Now Sec. 523 of the Code.

Our Supreme Court has succinctly pointed out the difference between actual and constructive fraud as follows:

"The term fraud is used in various senses. It may involve an evil intent or it may consist only of a wrongful act intentionally done to the injury of another. The former is actual fraud, the latter constructive. The former involves moral turpitude or intentional wrong. The latter may exist without the imputation of bad faith or immorality." *In re Campbell's Will*, 100 Vt. 395, 402, 138 A. 725; *Pelton's Exr. v. Dumas*, 117 Vt. 13, 17, 84 A.2d 408.

■ The credible evidence does not support such fraud on the part of the Debtor as would make the debt nondischargeable. It is apparent that at the time that he retained the services of the Plaintiff he, in good faith, intended to make payment of the salary to which she was entitled. However, like all debtors who find themselves in financial straits he was thwarted in his efforts. His restaurant business was a loser from its inception and he was in no position to fulfill his obligation to the Plaintiff. The hiring agreement between the Plaintiff and the Debtor was one that anticipated performance in the future. The failure of performance of such a contract is no basis for actionable fraud. Neither representations of fact that will exist in the future nor mere promises, though false and intended to deceive, afford the basis of actionable fraud. *Woods v. Scott*, 107 Vt. 249, 178 A. 886; *Comstock, et al. v. Shannon et al.*, 116 Vt. 245, 250, 73 A.2d 111.

And in *Hunt v. Lewis*, 87 Vt. 528, 531, 90 A. 578, our Supreme Court said:

"An actionable misrepresentation must relate to a present or past state of facts. *Belka et al. v. Adams*, supra. Representations of intentions, or promises, having reference merely to the future, constitute no ground of action. An action of deceit does not lie for failure on the part of a promisor to perform a promise made by him to do something in the future, which he does not intend to do and subsequently refuses to do, although the promisee has acted in reliance on such promise to his damage. 1 Jaggard on Torts, 583, 584; Bigelow on Frauds, 11, 12; *Robinson v. Parks*, 76 Md. 118, 24 A. 411; *Patterson v. Wright*, 64 Wis. 289, 25 N.W. 11; *Dawe v. Morris*, 149 Mass. 188, 21 N.E. 313, 4 L.R.A. 158, 14 Am.St.Rep. 404. The distinction between a representation that something exists which does not, and a representation, or more properly a promise, that something shall be done thereafter, is obvious."

The conclusion is inevitable that there was no intent to deceive on the part of the Debtor. To hold otherwise would thwart the very purpose of the Bankruptcy Code which is to give the debtor a "new opportunity in life and a clear field for future effort, unhampered by the pressure of pre-existing debt..." *Lines v. Frederick*, 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970).

The Complaint should be dismissed and judgment is being entered for the Defendant.