**In re SAN JUAN HOTEL CORPORATION, Debtor. (B–80–00259(A)).**

**Hans Lopez STUBBE, Chapter 7 Trustee, Plaintiff,**

**v.**

**Hector RODRIGUEZ ESTRADA, Defendant.**

**Civ. No. 85–1089 (JAF).**

United States District Court, D. Puerto Rico.

March 4, 1987.

414

William J. Dean, U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Manuel González-Gierbolini, San Juan, P.R., for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

FUSTE, District Judge.

 A trustee is one to whom something is entrusted in order to keep or administer it. Said person is legally committed in trust and must administer for the benefit of a named beneficiary or for a purpose recognized as lawful by statute. A trustee is one in whose hands the effects of another are attached by the trustee process. He is a guardian of his ward's property.

Trust, by its own definition, implies assured reliance on some person or thing. It is a dependence on the character, ability, strength or truth of someone or something. Trust entails belief, faith, and hope. It is a charge or duty imposed in confidence or as a condition of some relationship.

 In a bankruptcy-law context, a trustee has always been bound by the above-mentioned principles. 11 U.S.C. sec. 323(a); 2 *Collier on Bankruptcy* para. 323.03 (15th ed. 1985). It being legal in origin and closely related to equity, we say that under bankruptcy-law principles, the figure of the guardian is a strict trusteeship. An operating trustee, as a reorganization trustee, is a representative of the bankruptcy court. Equity tolerates in bankruptcy trustees no interest or posture adverse to the trust. By the exclusion of the trustee from any adverse personal interest, the principles stated here expect that all goes well and that the estate-trust-

ee legal mechanism contained in our bankruptcy code avoid such delicate inquiries as we have here, into the conduct of one such officer. *Mosser v. Darrow*, 341 U.S. 267, 271, 71 S.Ct. 680, 682, 95 L.Ed. 927 (1951). We will now recite the facts as found.

The file of this cause shows that this action was instituted by Hans López Stubbe, the actual Chapter 7 liquidation trustee of debtor San Juan Hotel Corporation. The defendant, Héctor Rodríguez Estrada, former Chapter 11 operating trustee and Chapter 7 liquidation trustee, faces a serious charge. It is claimed that he acted negligently[1] as a Chapter 11 operating trustee, with willful, deliberate, intentional disregard for the consequences of his actions upon the debtor's estate. It is further claimed that his actions extended for a brief period of time while he served as an interim Chapter 7 trustee and until a creditors' committee, by unanimous vote, removed him from office.

The trial of this action was held January 26 to February 4, 1987. The court received the testimony of several witnesses. The defendant failed to testify. Both parties presented in evidence a substantial number of exhibits. After a careful evaluation of the evidence, both direct and circumstantial, and after passing upon the demeanor and credibility of witnesses, we enter our Findings of Fact, Conclusions of Law, and Order of Judgment. Fed.R.Civ.P. 52(a). We find for plaintiff.

### Findings of Fact

■ The jurisdiction of this Federal District Court is found in 28 U.S.C. secs. 1334, 1471; *In re Pac. Homes*, 611 F.2d 1253 (9th Cir.1980),[2] it being proper for the United States to prosecute this suit against Rodrí-

guez Estrada on behalf of the estate. *In re El San Juan Hotel v. Héctor Rodríguez Estrada*, 809 F.2d 151 (1st Cir.1987).

On May 20, 1980, San Juan Hotel Corporation, then indebted to a great number of creditors in the amount of some $40 Million, filed a petition for relief and corporate reorganization under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. secs. 1101–1146 (1978).

Shortly thereafter, on July 10, 1980, defendant Héctor M. Rodríguez Estrada was appointed by the bankruptcy court to serve as an operating Chapter 11 trustee. This was done pursuant to 11 U.S.C. secs. 1104 and 1108 (1978). The trustee was vested with the powers and duties of the office under the Bankruptcy Reform Act of 1978, 11 U.S.C. secs. 1105–1106 (1978). We note that the appointment was made to serve without bond.[3]

Four days after his appointment, defendant trustee Rodríguez Estrada filed his first trustee's report, Exh. 54. There he recognized that it would be presumptuous and irresponsible on his part to consider his first report as a final one (meaning that his first report was a preliminary report), inasmuch as he needed time to familiarize himself with the debtor's activities in order to bring about a substantiated forecast on the business of the hotel. Notwithstanding, the defendant trustee recognized, at this early stage of intervention, that there existed three alternatives to deal with the case, to wit: (1) the continuance of debtor's operations as a hotel; (2) the temporary closing of debtor's operations and reopening during the forthcoming late 1981–82

---

1. Negligence is not the only issue. It turns out to be unimportant. Rodríguez Estrada was given, and indeed took it upon himself to exercise, blanket authority for the operations. Therefore, we look at this case to see whether the actions of the trustee were willful, deliberate, intentional. *Mosser v. Darrow*, 341 U.S. at 272, 71 S.Ct. at 682.

2. "Plenary actions brought by the trustee in a reorganization proceeding must be heard by a district judge, unless the defendants consent to the jurisdiction of the bankruptcy judge." *In re Pac. Homes*, 611 F.2d at 1107.

3. *See* 11 U.S.C. sec. 1104(b)(2) (1978). Here the debtor's fixed, liquidated, and unsecured debts exceeded $5 Million. Therefore, the appointment of an operating trustee was mandatory. *See also* 11 U.S.C. secs. 321–22 (1978). We have no evidence that the trustee was determined to be competent before appointment; therefore, he is presumed competent. We received no evidence on the rationale behind his appointment without bond.

peak tourism season, and (3) the conversion of the case to a Chapter 7 proceeding.

By July 24, 1980, the trustee represented to the bankruptcy court that he was now familiar with the involved and complicated nature of debtor's business, being in full understanding of the extensive nature of his duties and responsibilities as a trustee. Exh. 55. Compensation was requested. The court approved his request the same day, fixing a provisional $750 a week allowance, plus expenses incurred in the performance of his duties. He was authorized to draw as allowed, subject to final liquidation. *See* 11 U.S.C. sec. 326(a) (1978).

On March 24, 1983, after two years and ten months of extremely troubled financial operations, the Chapter 11 reorganization proceeding was converted, upon motion of the Puerto Rico Electric Power Authority, to a Chapter 7 liquidation proceeding. Rodríguez Estrada acted as the Chapter 7 liquidation trustee until September 1983, when the unanimous vote of creditors was instrumental in his removal. The plaintiff trustee was subsequently elected as a Chapter 7 trustee. At this time, the estate had incurred in accumulated deficits as follows:

SAN JUAN HOTEL CORPORATION

Statements of Accumulated Deficit [4]

Years ended May 31, 1982 and 1981

| | 1982 | 1981 |
|---|---|---|
| Balance at beginning of year: | | |
| As previously reported | $39,627,787 | $38,967,172 |
| Adjustment—Reduction on property taxes liabilities due to the retroactive effect of a tax exemption grant (note 12) | 824,336 | 824,336 |
| As restated | 38,803,451 | 38,142,836 |
| Net loss for the period | 1,743,382 | 660,615 |
| Balance at end of year | $40,546,833 | $38,803,451 |
| Analysis of accumulated deficit as of May 31: | | |
| Pre-petition | $38,142.836 | $38,142,836 |
| Post-petition | 2,403,997 | 660,615 |
| | $40,546,833 | $38,803,451 |

4. Plaintiff's Exh. 206, equivalent to Defendant's Exh. S, reproduced as Addendum A to this

The record shows that on or about March 27–31, 1983, the hotel closed to the public. The known hotel's financial position for the taxable year ending May 31, 1981, seen in light of the financial position at the end of 1982, leads to the inescapable conclusion that the debtor's business during the Chapter 11 reorganization financed its operation during both 1981 and 1982 from the moneys which eventually became due and owing to post-petition creditors. Rodríguez Estrada was privy to this situation at all times.

Outside auditors disclaimed. The financial statements were prepared on the basis of accounting principles applicable to a going concern. Auditors refused to express any opinion on the prepared statements. Exhibit 18, seen in light of Exhibit 206 and S.

The evidence established that as early as May 1981, it was obvious to debtor's comptroller, Marshall J. Kagan, and to Rodríguez Estrada, that a reorganization plan was not possible. Kagan's cash flow projections of May 1, 1981 showed that payments in the first year of reorganization would require some $3,760,000. The company's profit before interest and depreciation was $1,824,000 through March 31, 1981. No increase in revenue was expected for the remainder of the fiscal year. Not considering payment of the balance due to the largest secured creditor, Connecticut General Insurance Co., or expenditures for capital improvements, a reorganization plan would be almost $2 Million short. Even if payments to unsecured creditors of about $1 Million would be withheld, the amounts payable would be some $2,760,000, or about $1 Million more than what they could currently provide from hotel operations. Outside funding or increased profits were a must for debtor to survive. The third alternative, that is, conversion to a Chapter 7 liquidation, was the only sensible solution. *See* Plaintiff's Exh. 107 and 113.

memorandum opinion.

The above having been established, we now look at the course of action of former trustee Rodríguez Estrada during the years 1980 to 1983. It shows how his intervention, or lack thereof, contributed to the eventual collapse of the prolonged Chapter 11 reorganization, all in detriment of creditors. These specific findings show how the former trustee breached his statutory duties, 11 U.S.C. sec. 1106 (1978), and benefited from this ill-fated operation until removed in September 1983.

The defendant trustee, Rodríguez Estrada, seeking personal gain, and by willful, deliberate, intentional, and reckless conduct, disregarding the impact his actions and omissions would have upon the debtor's estate, failed to follow the advice of the hotel comptroller, Marshall J. Kagan, on proposed actions which could have substantially reduced operating expenses. This was essential if the debtor's reorganization was the trustee's goal. During the period 1980 to 1983, Kagan wrote abundant memoranda to the defendant trustee, disclosing the contemporaneous assessments of a qualified Certified Public Accountant and comptroller with vast experience in the hotel business.[5] Defendant Rodríguez Estrada did not follow the advice of debtor's comptroller. The following saga of events occurred to the detriment of the estate.

Defendant trustee Rodríguez Estrada had a term of forty-five days from December 8, 1980, to file a reorganization plan with the bankruptcy court. A draft plan was prepared, but the same was never filed. It was evident, as early as May 1981 and not later than August 1981, that payments under such plan could not be met. The great weight of the evidence is that the defendant trustee failed to inform the court of the reasons why no viable plan could be filed. Furthermore, the defendant failed, in light of this reality, to recommend to the bankruptcy court a conversion of the case to Chapter 7. Be it remembered that since May 1981, conversion was the alternative of choice. Defendant Rodriguez Estrada knew all along that the debtor's business was on the rocks.

When Rodríguez Estrada came to the hotel as operating trustee, he acquired knowledge of the fact that the hotel had a patronage-type excessive payroll of some 800 employees. Occupancy rates fluctuated between fifteen to thirty per cent. After the filing of the Chapter 11 petition, and while the hotel was debtor in possession, that is, for the period May 20, 1980 to July 10, 1980, the collective bargaining agreement with the Gastronomical Workers Union, Local 610, was rejected. This allowed reducing the payroll to 350 employees. In turn, a previously-bargained 7.5% increase in wages as per the rejected union contract was spared, with savings for the first two years after rejection of about $1,260,000. A few weeks after assuming his functions as trustee, Rodríguez Estrada implemented the contract rejection. He negotiated with the Gastronomical Workers Union and surprisingly granted a first 7.5% increase effective January 1, 1981, with a second 7.5% increase to take effect one year later. This increased the hotel payroll by $420,000 for the year commencing January 1, 1981. The second year commencing on January 1, 1982 would cost an additional $840,000, for a total of $1,260,000. Rodríguez Estrada, in turn, granted a third increase of 12%. This last increase did not become effective, inasmuch as the hotel

---

**5.** Defendant wants us to find Kagan's credibility impaired by the fact that eventually he fired the comptroller. Therefore, we are told that Kagan was and is a disgruntled employee that now claims against his former employer. Conscious of such facts, we carefully scrutinized Kagan's testimony. There are parts of that testimony where reliability is preserved by the fact that he wrote abundant contemporaneous internal memos to the trustee as matters developed. We make reference to the following documents: Plaintiff's Exhibits 57–58, 61–68, 70, 72–73, 75–83, 85–86, 89, 91–99, 101, 103–104, 107–108, 112– 113, 115–120, 123–124, 126–127, 129–131, 135–137, 140–141, 143–147, 149–150, 153–154, 156–157, 159–161, 164–170, 176, 181, 192, 195–196, and 237. This evidence is overwhelming, especially when there is nothing on the part of the defendant trustee to show that the advice was unsound or that the same was followed. As a matter of fact, we find that Rodríguez Estrada respected Kagan's judgment. He used his services very late in the chronology of events regarding the trustee's interests in a nearby hotel, the Carib Inn.

closed before the effective date of the same. We find that Rodríguez Estrada, without any logical explanation, granted Gastronomical Workers Union, Local 610, the benefits which the debtor in possession had decided to reject.

In addition to the mentioned collective bargaining agreement with the Gastronomical Workers Union, Local 610, the hotel had a second collective bargaining agreement with the casino union, known as "Unión de Empleados de Casinos de Puerto Rico." It was obvious, and Kagan had so advised, that the casino contract had to be rejected to save approximately $1 Million a year. Rodríguez Estrada failed to follow said recommendation. About a year elapsed. The pressure mounted and, finally, in the summer of 1981, the trustee proceeded to reject the casino collective bargaining agreement. The trustee's post-rejection actions regarding the union were erratic. He failed to consistently implement the rejection, thereby causing extreme labor unrest which ultimately resulted in a strike of the casino workers. The strike lasted until the hotel closed in 1983. During the course of his dealings with the casino workers, defendant Rodríguez Estrada unlawfully fired the striking workers, against the advice of counsel. The National Labor Relations Board determined that he had indeed incurred in unfair labor practices and ordered the workers' reinstatement with back pay. Testimony received by the court estimated the back pay to be approximately $1 Million. Plaintiff's Exh. 250.

■ During the period May 20, 1980 through May 21, 1981, and, in fact, for the entire Chapter 11 period, Rodríguez Estrada failed to keep the creditors fully informed on the financial condition of the debtor. Defendant failed to file the reports and summaries of operations as required under the Bankruptcy Code, 11 U.S.C. sec. 704(7) (1979); failed to file his receipts and disbursements reports on time, and failed to send such reports on a regular basis to the appropriate local and federal taxing authorities. The trustee intentionally concealed the true condition of the corporation when requests were made by parties in interest. The evidence is overwhelming in this respect. The testimony of Abelardo Ruiz-Suria, a lawyer for Connecticut General Life Insurance Co., the hotel's largest-secured creditor, as well as that of Jorge Manrique, Internal Revenue Service, Ruth Fonseca, Puerto Rico Department of Treasury, and Juanita Otero, Gastronomical Workers Union, Local 610, confirm this finding. The Kagan memoranda contain clear and convincing evidence that the hotel was not going to make it. This was not communicated to the court or creditors at any time. Connecticut General, which since the beginning fought to lift the automatic stay in order to execute their multi-million-dollar mortgage over the hotel's real estate, did not receive information from the trustee regarding the faithful execution of certain stipulations to which Connecticut General had consented in an effort to cooperate with the bankruptcy proceeding. Under the stipulations, plaintiff's Exh. 269, Connecticut General was entitled to financial information. Connecticut General had to resort to the court to obtain relief and eventual execution of the mortgage.[6] In this sense, the testimony of Jorge Manrique, Internal Revenue Service, is most revealing. Rodríguez Estrada represented to said Internal Revenue Service Special Procedures Advisor that he was in

---

**6.** Rodríguez Estrada's purpose behind the concealment of material financial information and the January 1981 stipulation with Connecticut General was to maintain the hotel in operation and sell the same if possible. This meant a larger fee to the defendant, as well as the continuing economical benefit from his weekly draw in fees and expenses. Transcript of Proceedings, Testimony of Kagan, Jan. 27, 1987 session, at 104–105. *See also* 11 U.S.C. sec. 326(a) (1978). The Connecticut General stipulation provided that if the debtor's hotel was closed, even temporarily, a judgment of execution of mortgage could be requested immediately. In this respect, the trustee, knowing of the economical impossibilities of a reorganization, elected to continue the operation during the low summer season of 1981, when closing down, at least temporarily, for the low season, was the only alternative of choice. This, seen in light of all the evidence, leads us to conclude that the best interests of this Chapter 11 reorganization were second to those of the trustee.

a position to satisfy the post-petition tax obligations. Representations of payment and promises of payment were made as a dilatory tactic in order to keep Chapter 11 reorganization alive. The Puerto Rico Department of Treasury was also misinformed. Ruth Fonseca testified that the Bankruptcy Division of the Puerto Rico Department of Treasury did not receive periodic reports from the trustee that would alert them to the precarious financial condition behind the reorganization. As a matter of fact, the trustee managed to convey to the Treasury Department a conflicting message. A tax exemption and payment plan was entered into when it was known to him that compliance was impossible. · As of January 29, 1987, the following was due and owing to the Government of Puerto Rico:

1. Property Tax: $1,744,290.66, plus $461,353.66, representing interests and surcharges, for a total of $2,205,644.32;

2. Income Tax withholdings from employees: $772,941.86, with interest at $221,993.37, and penalties at $73,094.50, for a total of $944,935.23;

3. Personal property taxes: $156,470.01, with interest at $52,725.02, and penalties at $14,090.28, for a total of $223,285.31;

4. Excise taxes: $353,525.13, with interest at $60,533.31, and penalties at $38,917.18, for a total of $452,975.62.

■ Despite having funds on hand to do so, the defendant failed to pay not only the local taxes, but also federal payroll-related taxes which accrued during his tenure as trustee, thereby causing the estate to incur in tax deficiencies, penalties, and interest charges. The failure of the defendant to pay taxes to the Government of Puerto Rico and to the United States constitutes a breach of the duties imposed upon the trustee by the United States Bankruptcy Code, 11 U.S.C. secs. 704(7) and 505(b)(1) (1979). In so doing, he failed to conserve and protect the interests and assets of the estate.

■ Regarding the federal payroll-related taxes, the record shows that the defend-ant filed the 1982 Federal Unemployment Tax Act return (FUTA tax), claiming as a credit $143,000 he had allegedly paid the Department of Labor, Commonwealth of Puerto Rico, for the same concept. The trustee knew that no such payment had been made. Rodríguez Estrada intentionally and maliciously violated 26 U.S.C. sec. 6672, in that he attempted to evade or defeat and pay over these taxes. The resulting obligation to the United States is as follows:

1. Post-petition taxes (not including tax deficiencies determined), on FICA and FUTA taxes, for the period trimester ending December 1980 up to and including March 31, 1983, plus interest and penalties: $870,592.53;

2. Post-petition taxes (deficiencies), plus interest and penalties, on FICA and FUTA, for the period trimester ending December 1980 up to and including March 31, 1983: $369,871.69, all for a total tax obligation of $1,240,464.22 on FICA/FUTA payroll-related taxes.

The Gastronomical Workers Union, Local 610, was also seriously affected by the trustee's failure to report or by the concealment of material information. The Union's pension fund lost $94,094 in dues. These dues, agreed as per collective bargaining agreement, were supposed to be paid every month. Checks were not received. Telephone calls to the hotel's trustee remained unanswered. The last payment received was in February 1982 for July 1981. There came a point in time in which the trustee failed to send payroll data for over 300 employees who worked in the hotel. This data was needed to determine contributions to the Union's pension fund.

Because of this failure to keep creditors fully informed as to the financial condition of the debtor, the defendant deprived the creditors from their right to be heard as to whether the debtor should remain in Chapter 11 reorganization.

■ During his tenure as Chapter 11 trustee, the defendant wrote off, or approved the writing off, of certain casino accounts receivable which secured debtor's

loan by Banco Popular de Puerto Rico. The trustee failed to give notice to the bank or to any other creditor of the estate. After the proceeding was converted to a Chapter 7 liquidation, Banco Popular discovered that $273,832.94 in accounts receivable, constituting part of the bank's security for the loan, could not be accounted for by the trustee. Defendant's actions in writing off these accounts receivable without notice to creditors and the secured creditor constitutes a breach of defendant's fiduciary duties. In this sense, he failed to properly account for all property received by him as trustee.[7]

The casino account, if it could be audited, will prove to be a boxful of surprises. One example, in addition to the Banco Popular accounts, is enough to illustrate the point. In August 1982, the defendant, without consulting the bankruptcy court, settled a gambling debt of $33,500. He accepted four Aries K automobiles and $5,000 in complete satisfaction of the gambling debt, and wrote off the remaining balance due. The cars were worth some $20,000; therefore, he wrote off $8,500. Thereafter, he extended a line of credit of $5,000 to the same gambling patron. The four automobiles were registered in the names of four employees of the hotel, one of them being Miguel de Angel. They were later sold without notice to the creditors or to the bankruptcy court.

During his tenure as Chapter 11 trustee, the defendant ordered the remodeling of the presidential suite of the hotel at a cost to the debtor's estate of some $15,000. He dedicated the premises to his very personal use. He kept the keys to the suite and only those authorized by him could gain access. Also, the defendant ate meals at the hotel, consumed liquor of the hotel, and allowed persons listed in Exhibit 116 to eat free at the hotel's Pablo's Restaurant. The only limitation was that those privileged would not be served shrimp cocktail, sirloin steak, filet mignon, and roast beef. In turn, he authorized six named persons, as per Exhibit 123, to include gratuities in their checks, also at the debtor's expense.

In August 1982, the defendant held his daughter's wedding reception at the hotel. A full course luncheon, complete with champagne and liquor, was served to about 200 guests. He charged himself for the event a little bit under $6,000, it being obvious that such an action was in reproachful conflict of interest. We find that defendant's failure to pay for his ludicrous use of the presidential suite and for the meals and drinks that his favored ones had for free, constitutes a serious breach of defendant's fiduciary duty to act only in the best interests of the estate, to conserve the property of the estate, and to place the interests of the estate and other parties in interest above his own, all outside the scope of his duties as trustee. The incident regarding the wedding reception speaks for itself. It oozes conflict of interest through every pore.

The defendant's activities in the hotel went beyond those traditionally accepted by the hotel industry in Puerto Rico. The defendant held a dinner boxing show at the hotel on January 23, 1981 which generated a loss of $10,987. The hotel's comptroller advised him of the loss and that no further dinner boxing should be held. The defendant once again went against sound advice and held two additional dinner boxing shows which generated losses of some $10,000 each. The defendant trustee issued complimentary tickets in great number to his friends and acquaintances for all these events.

During his tenure as a trustee, defendant Rodríguez Estrada employed and paid certain professionals without obtaining prior authorization from the bankruptcy court. 11 U.S.C. sec. 327. In some cases, the authorization was requested and obtained after the services were rendered. On one occasion, leave of court was obtained to carry out a specific task. Later, the pro-

7. Puerto Rico has not adopted the Uniform Commercial Code. Therefore, the "secured transaction" concept of Chapter 9 of the Code is of no application. Puerto Rico has adopted the traditional figures of secured transactions, such as assessment of accounts receivable. *See* 10 L.P.R.A. sec. 584.

fessional received further instructions from the trustee to perform additional work. He did so and the bankruptcy court later approved part of the services. The professional involved had to return some money paid to him by the defendant trustee. These persons were Miguel de Angel, Eddie Ramirez Vale, Manuel Solis, and Sam Schweitzer. Since some of the appointments/payments were later approved by the bankruptcy court *nunc pro tunc,* we do not pass upon the correctness of the bankruptcy court decisions. We simply point out the form in which the appointments were made by the trustee to show how these acts, along with others here explained, make it evident that the trustee was running this Chapter 11 bankruptcy as if it was his own private business.

■ Defendant Rodríguez Estrada employed Miguel de Angel as a consultant. De Angel was an accountant who had worked as an external auditor for San Juan Hotel Corporation, as well as for the debtor's one-time principal stockholder Louis Puro, a suspect recipient of preferential payments. In turn, de Angel had also performed substantial work for other related, subsequently insolvent, corporate holdings of San Juan Hotel Corporation for approximately ten years prior to bankruptcy. Reasonable fact-finders may infer from the evidence received that de Angel was more than a consultant. At times he acted like a regular employee. He had been close enough to unsound business practices of the hotel which lead and contributed to bankruptcy so as not to qualify as a "disinterested party" under 11 U.S.C. sec. 327 (1978). The trustee knew such person could not qualify for appointment by the bankruptcy court as an accountant/consultant for the trustee. This accountant was paid $91,800 for his services, for the period July 1980 to approximately September 1983. The appointment and compensation were approved *nunc pro tunc* by the bankruptcy court on August 15, 1985. In turn, de Angel and the defendant trustee allowed some of the work to be channelled through a de Angel-owned corporation by the name of Investment & Finance Interamerica Ltd. This firm billed an additional $6,500 in services which de Angel allegedly performed without first obtaining the authorization of the bankruptcy court. De Angel was Mr. Rodriguez Estrada's right hand in devising means to cover up the hotel's precarious economical position. This accountant allowed that he, as well as others, be paid partly in cash against invoices whose concept was not defined by any acceptable means. He took expense allowances for which he did not account, and rendered services which were simply labeled "consulting services." The rates were as high as $900 a week. This person was at a given time responsible for determining which checks would be written, which written checks would be sent out, and which checks would be issued knowing that there were insufficient funds. *See* Exh. 34. As a matter of fact, the trustee appointed Mr. de Angel Finance Director of the hotel. As such, he was part and parcel of those acts of the trustee which we find as not being in keeping with the straightforward principles of trustee management.

The case of attorney Eddie Ramírez Vale and the work he performed for the estate must be mentioned. The defendant obtained from the bankruptcy court permission to recruit attorney Eddie Ramírez Vale to assist the operating trustee in securing the previously-mentioned tax-exemption decree and a payment plan of taxes due and owing for the debtor hotel. A maximum compensation of $50,000 was initially authorized by the bankruptcy court. Mr. Ramírez Vale obtained for the benefit of the estate the tax exemption and payment plan; however, contrary to an order of the bankruptcy court of November 28, 1981, he was paid by the trustee $82,850, without complying with specific dispositions of the Bankruptcy Code. Some additional work had been ordered by the trustee without court approval. On August 30, 1985, the bankruptcy court retroactively approved payment of the originally-planned maximum compensation of $50,000. Payment of the additional $32,850 paid for additional services and/or requests for *nunc pro tunc* approval were denied. Later, pursuant to a stipulation entered into between

the plaintiff in this case, Hans López Stubbe, and Mr. Ramírez Vale, an additional $13,000 were approved to settle the dispute. This shows and confirms our previous finding. The Chapter 11 defendant trustee, Rodríguez Estrada, acted with this estate as if it was his own.

■ Defendant Rodríguez Estrada employed and paid the former president of the debtor corporation, Sam Schweitzer, $12,-350 to act as a special advisor to the trustee, without ever obtaining the authorization of the bankruptcy court. We find that the former president of the debtor was not a disinterested party within the meaning of the United States bankruptcy laws, 11 U.S.C. sec. 327 (1978), and, therefore, could not be qualified for such an appointment. Mr. Schweitzer was too close to the former leading figure of Louis Puro. Preferential payments to Mr. Puro were suspected. This was enough not to retain Schweitzer. In the same fashion, Rodriguez Estrada employed and paid a former employee of the hotel, Manuel Solís, some $10,200 to act as a special assistant to the trustee, without ever obtaining the authorization of the bankruptcy court. De Angel, Schweitzer, and Solís responded to the interests of the trustee, and not to those before the bankruptcy court.

We further find that between January of 1982 to March 1983, defendant disbursed to himself $37,350 in funds belonging to the estate for "expense allowances." These moneys were drawn against a checking account that the debtor kept at the Sterling National Bank of New York. These expenses remained unsupported at the time of trial. We find that the payments were not for expenses. The weekly payments of $1,350 up to May 27, 1982 for a total of 21 weeks, and of weekly payments of $300 thereafter until March 24, 1983, for a total of thirty weeks, amounted to additional compensation to the trustee.

■ The evidence further shows that trustee Rodriguez Estrada had evidence before him indicative of misappropriations and/or preferential payments of money to Mr. Louis Puro, a stockholder and former director of the debtor corporation. The defendant trustee failed to investigate this matter when it was evident that no less than $66,000 in potential preferential payments were red-flagged as part of the draft schedules to be filed by the debtor. There is no excuse for this failure to act on the part of the defendant trustee. 11 U.S.C. sec. 704(3) (1979).

After the hotel closed operations, the defendant continued operating a kiosk known as "Victoria Station" on the beach property of the debtor. The kiosk was supplied from the hotel stock. No records for this operation were kept. The resulting income or loss remains unaccounted. The trustee was the operator.

■ This court finds that the defendant trustee granted economical benefits to some parties and prolonged the economical agony of the debtor in order to continue drawing fees and expense accounts, make use of cars to which the debtor had access, use the presidential suite, consume meals, and multiple other benefits. Although we are invited to find that the defendant acted out of ignorance or mere oversight, the overwhelming evidence is to the effect that he acted out of avarice, seeking his own benefit, in continuous violation of the Bankruptcy Code.

The trustee kept the court, the comptroller, and counsel, as uninformed as possible. Rodríguez Estrada acted like Louis XIV in Versailles. There he reigned, did as he pleased, overwhelmed by the past glories of the El San Juan Hotel. This simply cannot be condoned. Evidence of the above is patent from the docket of the bankruptcy proceedings. One additional example illustrates the point. On January 28, 1983, the bankruptcy court, because of the defaults of the debtor corporation towards its largest secured creditor, Connecticut General, proceeded to convert the proceeding to a Chapter 7 liquidation. The trustee, fully aware that the operation had no opportunity of success, even under Chapter 7, moved the court to reconsider the matter. The court did so by means of an order dated February 9, 1983. Rodríguez Estrada continued to act as

Chapter 11 operating trustee until the final conversion took place in March 1983.

After his removal from office by the creditors in September 1983, defendant unreasonably delayed the turning over of some records of the estate to the new Chapter 7 trustee, Hans López Stubbe. When the records were finally turned over, they were in total disarray. Two persons worked for six months to organize the records. It was discovered that approximately eight months of petty cash records, the preferred method of payment during Rodríguez Estrada's reign as a trustee, were missing, along with various payroll journals and general ledger records for the periods involved.[8]

### Conclusions of Law

■■■■ The defendant's term of trusteeship accrued under the provisions of the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549 (1978) (11 U.S.C. secs. 101–1330). In determining the trustee's responsibility towards the estate, the landmark case of *Mosser v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951), is of application. The Supreme Court recognized that equity tolerates in bankruptcy trustees no interest adverse to the trust, not "[b]ecause such interests are always corrupt but because they are always corrupting." *Mosser*, 341 U.S. at 271, 71 S.Ct. at 682. The decision established the general rule for personal liability.[9] The trustee is personally liable if he acted willfully and deliberately, disregarding the estate's best interests. *See also United States v. Howard*, 302 U.S. 445, 450, 58 S.Ct. 309, 312, 82 L.Ed. 352 (1938). In the exercise of his duties towards the estate, a trustee is protected with a specie of qualified immunity.[10] His pocket will not be called to compensate the damages he has caused if such damages, in the broadest definition of the

word, accrued during the normal operation of the estate while the trustee was proceeding in good faith under what reasonable men would define as acceptable procedures or guidelines. However, if a trustee acts beyond the powers conferred upon him by the law, or ignores his lawful duties, he necessarily assumes individual responsibility. *See 4 Collier on Bankruptcy para.* 704.04[2] at 704–13 (15th ed. 1985).

■■■ In this case, we find that liability is predicated and found on the most stringent standard. Here, the defendant trustee not only violated the law. Here, it is clear that he owed a duty to administrate properly and that he breached said duty by conduct that can only be characterized as more than negligent, i.e., intentional. *See generally*, as compared with *Mosser, In re Rigden*, 795 F.2d 727 (9th Cir.1986); *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1357 (9th Cir.1983); *c.f., Ford Motor Credit Co. v. Weaver*, 680 F.2d 451 (6th Cir.1982).

In the context of this case, we do not need to differentiate between acts of mere negligence towards third parties and acts of willful disregard. This is not a case of liability of a trustee in his official capacity (mere negligence). This is a case of personal liability (willful disregard). *In re Tucker Freight Lines, Inc.*, 62 Bankr. 213 (W.D.Mich.1986), seen in light of *Mosser v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951). Here, defendant, disregarding his statutory duties as a trustee and ignoring with bad purpose the economical probabilities of a Chapter 11 reorganization, (a) failed to follow the debtor's comptroller's recommendations to collect or attempt to collect all the assets of the estate. Furthermore, he failed to supervise and properly direct persons hired by him. *E.g., Leonard v. Vrooman*, 383 F.2d

---

**8.** The evidence shows that defendant more frequently than not caused wages, payments, and other compensations to be paid to employees, professionals, and suppliers against petty cash, without withholding the necessary amounts for federal and local taxes in the appropriate cases. This was discovered by the Internal Revenue Service. The evidence on this point is abundant and uncontroverted.

**9.** The facts in *Mosser* were not as shocking as in the present case. In *Mosser*, the principal issue concerning personal liability of a reorganization trustee assumed that the trustee made no personal profit. Here, it is obvious that the trustee acted as if the estate was his own.

**10.** *See generally*, but in a different context, *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

556, 560 (9th Cir.1967), *cert. denied,* 390 U.S. 925, 88 S.Ct. 856, 19 L.Ed.2d 985 (1968); *In re Power,* 115 F.2d 69 (7th Cir. 1940); *see also* 4 *Collier on Bankruptcy* para. 704–04 at 704–10–11; (b) failed, as an operating trustee, to pay taxes accruing against the estate during bankruptcy, thus being liable in this respect. *Collier* at 704–12, *citing Ingels v. Boteler,* 100 F.2d 915 (9th Cir.1938), *aff'd on other grounds,* 308 U.S. 57, 60 S.Ct. 29, 84 L.Ed. 78 (1939); (c) failed to act under the scope of powers conferred to him when he summarily discharged casino employees, knowing that he was incurring in unfair labor practices, which would, in the long run, dissipate assets of the estate; *see, e.g., Maguire v. Puente,* 120 Misc.2d 871, 466 N.Y.S.2d 934 (1983) (trustee personally liable for his wrongful use of corporate assets); (d) failed to keep proper record of receipts and of the disposition of the money and property received, *see* Bankr.R. 2015(a)(2), 6003; (e) failed to comply in many respects with 11 U.S.C. sec. 363(b) (1978) in that he used, sold or disposed of property of the estate, not in the ordinary course of business, without notice and hearing. *See In re Johnson,* 518 F.2d 246 (10th Cir.), *cert. denied sub nom Clark v. Johnson,* 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975); *Chappel v. First Trust Co.,* 30 F.Supp. 765 (E.D.Wis.1940) (trustee personally liable for losses on the estate).

This court cannot take lightly the defendant's actions. It is unheard of that a trustee can walk away impune when he wrote off casino debts without letting the court know of his reasons, took cars in payment of debts, which cars were registered under the names of hotel employees and not in the name of the estate, used the presidential suite for his very personal activities, held the wedding of his daughter at the hotel in open conflict of interest, took expenses from the New York Sterling Bank account, without properly accounting for them, favored union employees to the detriment of the estate, and used petty cash to pay left and right, without keeping adequate records. When a trustee acts like Héctor Rodríguez Estrada did, that is, in violation of his authority, the deviation should result in a surcharge against him. *See In re Cochise College Park, Inc.,* 703 F.2d at 1356; *Sherr v. Winkler,* 552 F.2d 1367, 1374 (10th Cir.1977); *In re Fidelity Mortgage Investors,* 550 F.2d 47, 57 (2d Cir.1970); *Albers v. Dickinson,* 127 F.2d 957, 960 (8th Cir.1942).

This record shocks the conscience. The violations here listed represent a selection of examples in a list of violations which is *numerus apertus.* They occurred in the context of a willful and deliberate pattern of conduct. The defendant milked the estate. His personal interest came ahead of the legitimate interests of the Chapter 11 reorganization. He failed to be reasonable and prudent in seeking sound alternatives less harmful to the estate, to the creditors, and, above all, to the post-petition creditors who got the worse part of it. We now find Héctor Rodríguez Estrada personally liable as follows. We have surcharged him only for those items that are beyond doubt:

■ 1. $1,260,000, representing pay raises approved by the trustee to the Gastronomical Workers Union, Local 610, for years 1981–82.

■ 2. Any amount up to $1 Million which the bankruptcy court may allow in the future under Chapter 7 liquidation proceedings to the casino employees illegally fired.

■ 3. $94,094 in dues owing to the Gastronomical Workers Union, Local 610.

■ 4. $461,353.66 in penalties and interests accrued during the period May 20, 1980 to March 31, 1983 on taxes due and owing to the Commonwealth of Puerto Rico.

■ 5. $1,240,464.22 representing the total post-petition tax obligation or FICA/FUTA payroll-related taxes.[11]

11. In the case of taxes due and owing to the Commonwealth of Puerto Rico, we adhere to the general rule of surcharging only penalty and interest. In the case of payroll-related taxes (FICA–FUTA), payable to the Internal Revenue Service, we assess the total post-petition obligation. The trustee had the money to pay and he deceived the Federal Government.

6. $273,832.94 representing improperly written off casino accounts receivable assigned to Banco Popular de Puerto Rico.

7. $15,000 representing the investment and use of moneys belonging to the estate as it relates to the defendant's occupancy of the hotel's presidential suite.

8. $6,000 representing the extra cost for the use of hotel facilities for the wedding reception of the trustee's daughter.

9. $30,987 representing the loss of the three dinner boxing shows held at the hotel.

10. $8,500 representing the best estimate of moneys due to the hotel by Joaquín Soler as a casino debt of $33,500.

11. $6,500 paid to Miguel de Angel under the name of Investment & Finance Interamerica, Ltd.

12. $37,350 in alleged expenses against the estate, drawn by defendant against the Sterling Bank of New York account.

Total surcharge excluding item No. 2, which is subject to future calculation: $3,434,081.82.

Finally, we have examined, but do not pass upon, defendant's pending application for final compensation before the bankruptcy court in the total amount of $462,985, Addendum B to this opinion and findings. However, leaving dollars and cents aside, an examination of the allegations there contained, in light of the evidence received here, further convinces us that defendant's liability is of such magnitude that he would not be entitled to a discharge under the equitable principles supporting bankruptcy. 11 U.S.C. sec. 523(a)(4).[12] The evidence received here is incompatible with the claims made there.

By virtue of the foregoing, judgment shall be entered on behalf of Hans López Stubbe, as trustee, for the benefit of San Juan Hotel Corporation, debtor case No. B–80–00259(A), and against the defendant, in the amount of $3,434,081.82, plus costs. A copy of this opinion shall be filed with the Clerk of the Bankruptcy Court for said court to be guided accordingly.

IT IS SO ORDERED.

## ADDENDUM A —

### SAN JUAN HOTEL CORPORATION

### Financial Statements

### May 31, 1982 and 1981

#### TABLE OF CONTENTS

Accountant's Report

Financial Statements:

　Balance Sheets
　Statements of Loss
　Statements of Accumulated Deficit
　Statements of Changes in Financial Position

Accounting Policies

Notes to Financial Statements

---

12. Under the former Bankruptcy Code of 1898, this exception to discharge was enacted at sec. 35(a)(4). It was adopted in the Bankruptcy Act of 1978, and followed into existence in the Bankruptcy Amendments and Federal Judgeship Act of July 10, 1984. This section does not apply automatically. It applies only when the bankrupt seeking discharge was acting as a trustee before the debt accrued; in other words, the fiduciary relationship had to exist prior to the accrual of the debt in controversy. *See* *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Romero*, 535 F.2d 618, 621 (10th Cir.1976). Fraud or defalcation are grounds to deny discharge of a debt only when the debtor seeking discharge was the fiduciary of the creditor. *In re Talcott*, 29 B.R. 874 (D.Kan.1983). Fraud justifying denial of discharge consists of deceit, bad faith or immorality. *See In re Lamb*, 28 B.R. 462 (B.La. 1983); *In re Golo Waly*, 13 B.R. 781 (D.Vt.1981). The required elements are clearly present here.

**ROSALY, PEREZ VILLARINI AND CO.**
CERTIFIED PUBLIC ACCOUNTANTS

Mr. Héctor M. Rodríguez Estrada
Operating Trustee
San Juan Hotel Corporation:

 We have examined the balance sheets of San Juan Hotel Corporation
(debtor) as of May 31, 1982 and 1981, and the related statements of loss
and accumulated deficit and of changes in financial position for the years
then ended. Our examinations were made in accordance with generally
accepted auditing standards and accordingly included such tests of the
accounting records and such other auditing procedures as we considered
necessary in the circumstances.

 On May 20, 1980, the Company filed a petition for reorganization under
Chapter 11 of the Federal Bankruptcy Code. The District Court of the United
States for Puerto Rico appointed an operating trustee of debtor's hotel
business and ordered that the Company be operated by said trustee subject
only to further order of the Court.

 The Company and its subsidiaries sustained losses aggregating approxi-
mately $5,600,000 during the three years and six-month period ended May 20,
1980, and from time to time during recent years have experience a lack of
cash flow. The ability of the Company to continue operations in reorganiza-
tion, and to achieve sustantially improved operations is dependent upon many
factors, the most significants of which are: the ability to attain profitable
operations, and the design and confirmation of a plan or reorganization which
permits the continuance of the hotel operation as a going concern. We do not
express any opinion as to the Company's ability to continue operations as a
going concern basis.

 The accompanying financial statements have been prepared on the basis
of accounting principles applicable to a going concern. This basis presumes
that cash will be available to finance future operations and that the realiza-
tion of assets and settlements of liabilities, contingent obligations and
commitments will occur in the ordinary course of business, rather than through
a process of forced liquidation. Accordingly, such financial statements do
not purport to present: (1) the realizable value of all assets or their
availability on a liquidation basis, (2) the amount of priorities of liabi-
lities and contingencies which may be allowed in the reorganization proceedings
or (3) the effect upon shareholders accounts, or upon future operations, of
any changes which may be made in the capitalization of the Company or in the
manner of conducting its business.

LA RAMBLA SHOPPING CENTER-P.O. BOX 7539, PONCE, P.R. 00732-TEL.(809)840-2121-840-3434

Mr. Héctor M. Rodríguez Estrada
Operating Trustee
Page 2

 Because the matters discussed in the second, third and fourth paragraphs
may have a material effect on the financial statements of San Juan Hotel
Corporation as of May 31, 1982 and 1981 and for the years then ended, we
express no opinion on them.

 Subsequent to September 28, 1982, the date of this report, the
Court authorized the sale in public auction of the hotel's real estate
facilities and operating equipment. Such property was sold on March 21,
1983 and the hotel closed operations on March 27, 1983. Subsequently
the Court moved to convert San Juan Hotel Corporation into Chapter 7 of the
Code.

 /s/ Rosaly, Perez Villarini & Co.
 License No. 119
September 28, 1982, except Expires December 1, 1983
 for last paragraph which is
 April 12, 1983

## SAN JUAN HOTEL CORPORATION

### Balance Sheets

#### May 31, 1982 and 1981

| Assets | 1982 | 1981 |
|---|---|---|
| Current assets: | | |
| Cash (note 1) | $ 1,624,371 | 164,256 |
| Receivables (note 2): | | |
| Notes and accounts | 1,741,658 | 2,267,324 |
| Less allowance for doubtful receivables | 1,001,014 | 1,143,308 |
| Net receivables | 740,644 | 1,124,016 |
| Inventories (note 3) | 286,355 | 368,062 |
| Prepaid expenses and deposits (note 4) | 435,946 | 412,459 |
| Total current assets | 3,087,316 | 2,068,793 |
| Investment in and advances to wholly-owned subsidiaries (note 5) | - | - |
| Property and equipment (note 7): | | |
| Land | 401,772 | 401,772 |
| Buildings and improvements | 12,178,521 | 12,178,521 |
| Furniture and equipment | 8,180,640 | 8,140,597 |
| Operating equipment | 222,910 | 266,044 |
| | 20,983,843 | 20,986,934 |
| Less accumulated depreciation and amortization | 13,775,298 | 13,139,015 |
| | 7,208,545 | 7,847,919 |
| Other assets | 165,812 | 138,557 |
| | $10,461,673 | 10,055,269 |

See accompanying summary of significant accounting policies and notes to financial statements.

## SAN JUAN HOTEL CORPORATION

### Balance Sheets

#### May 31, 1982 and 1981

| Liabilities and Stockholders' Deficit | 1982 | 1981 |
|---|---|---|
| Current liabilities: | | |
| Post-petition debts (note 6): | | |
| Bank overdraft | $ 841 | 41,451 |
| Accounts payable trade | 2,345,401 | 735,207 |
| Accrued expenses and other liabilities | 2,171,717 | 1,400,255 |
| Total post-petition debts | 4,517,959 | 2,176,913 |

| | | |
|---|---|---|
| Pre-petition debts (notes 7, 8, 9 and 10): | | |
| Secured | 20,925,463 | 21,103,351 |
| Priority | 9,884,670 | 9,884,670 |
| Unsecured | 12,346,680 | 12,360,053 |
| | 43,156,813 | 43,348,074 |
| Total current liabilities | 47,674,772 | 45,524,987 |
| Stockholders' deficit: | | |
| Capital stock (note 13 and 14): | | |
| Preferred: | | |
| Series A-6% cumulative, par value $100, authorized, issued and outstanding 3,670 shares | 367,000 | 367,000 |
| Series B-6% cumulative, par value $100, authorized and issued 23,830 shares | 2,383,000 | 2,383,000 |
| Series C-8% cumulative prior, par value $100, authorized 2,950 shares; issued 2,752 shares | 275,200 | 275,200 |
| Common: | | |
| Par value $1, authorized 1,395,000 shares; issued 1,100,000 shares | 1,100,000 | 1,100,000 |
| Additional paid-in capital | 500,000 | 500,000 |
| Total capital stock | 4,625,200 | 4,625,200 |
| Accumulated deficit (note 12): | | |
| Pre-petition | 38,142,836 | 38,142,836 |
| Post-petition | 2,403,997 | 660,615 |
| | 40,546,833 | 38,803,451 |
| | 35,921,633 | 34,178,251 |
| Plus-capital stock held in treasury at cost | 1,291,466 | 1,291,467 |
| Net stockholders' deficit | 37,213,099 | 35,469,718 |
| | $10,461,673 | 10,055,269 |

## SAN JUAN HOTEL CORPORATION

### Statements of Loss

### Years ended May 31, 1982 and 1981

| | 1982 | 1981 |
|---|---|---|
| Revenues: | | |
| Rooms | $ 4,032,873 | 4,123,283 |
| Food | 3,756,045 | 4,255,367 |
| Beverages | 2,194,661 | 2,353,389 |
| Casino - Net win | 5,300,394 | 7,396,338 |
| Tour chartering | 890,030 | 1,601,137 |
| Telephone | 146,363 | 118,488 |
| Store rentals | 123,906 | 122,473 |
| Other operated departments | 54,115 | 70,823 |
| Other income | 750,364 | 651,954 |
| Total revenues | 17,248,751 | 20,693,252 |
| Departmental costs and expenses (note 15): | | |
| Rooms | 1,808,780 | 1,618,754 |
| Food and beverages | 4,900,341 | 4,991,527 |
| Casino | 4,241,208 | 6,232,881 |
| Telephone | 335,903 | 317,326 |
| Other operated departments | 1,129,206 | 1,786,274 |

| | | |
|---|---|---|
| Total costs and expenses | 12,415,438 | 14,946,762 |
| Total operated departments income | 4,833,313 | 5,746,490 |

Undistributed operating expenses:

| | | |
|---|---|---|
| Administration and general | 1,546,232 | 1,903,900 |
| Marketing | 919,119 | 817,423 |
| Property operation and maintenance | 596,760 | 696,254 |
| Energy costs | 1,482,715 | 1,228,836 |
| Total undistributed expenses | 4,544,826 | 4,646,413 |
| Income before fixed charges | 288,487 | 1,100,077 |

Fixed charges:

| | | |
|---|---|---|
| Insurance and municipal taxes | 168,250 | 208,433 |
| Interest | 1,208,001 | 849,284 |
| Depreciation and amortization | 655,618 | 694,117 |
| | 2,031,869 | 1,751,834 |
| Net loss before advance to wholly-owned subsidiary | 1,743,382 | 651,757 |
| Advance to wholly-owned subsidiary – written off | - | 8,858 |
| Net loss | $ 1,743,382 | 660,615 |

See accompanying summary of significant accounting policies and notes to financial statements.

### SAN JUAN HOTEL CORPORATION

### Statements of Accumulated Deficit

### Years ended May 31, 1982 and 1981

| | 1982 | 1981 |
|---|---|---|
| Balance at beginning of year: | | |
| As previously reported | $39,627,787 | 38,967,172 |
| Adjustment – Reduction on property taxes liabilities due to the retroactive effect of a tax exemption grant (note 12) | 824,336 | 824,336 |
| As restated | 38,803,451 | 38,142,836 |
| Net loss for the period | 1,743,382 | 660,615 |
| Balance at end of year | $40,546,833 | 38,803,451 |
| Analysis of accumulated deficit as of May 31: | | |
| Pre-petition | $38,142,836 | 38,142,836 |
| Post-petition | 2,403,997 | 660,615 |
| | $40,546,833 | 38,803,451 |

See accompanying summary of significant accounting policies and notes to financial statements.

SAN JUAN HOTEL CORPORATION

Statements of Changes in Financial Position

Years ended May 31, 1982 and 1981

| | 1982 | 1981 |
|---|---|---|
| **Funds provided:** | | |
| Decrease in accounts receivable | $ 383,372 | – |
| Decrease in inventories | 81,707 | – |
| Increase in accounts payable | 1,610,194 | – |
| Increase in accrued expenses | 771,462 | – |
| Post-petition debts | – | 2,176,913 |
| Used of operating equipment | 43,134 | – |
| Decrease in other assets | – | 32,397 |
| | $2,889,869 | 2,209,310 |
| **Funds used:** | | |
| In operations: | | |
| Net loss | $1,743,382 | 660,615 |
| Deduct item not requiring funds: | | |
| Depreciation and amortization | 655,618 | 694,117 |
| Funds used (provided) in operations | 1,087,764 | (33,502) |
| Increase in other assets | 46,589 | – |
| Increase in receivables | – | 397,848 |
| Increase in inventories | – | 76,864 |
| Increase in prepaid expenses and deposits | 23,487 | 203,374 |
| Additions to property and equipment | 40,043 | 113,772 |
| Repayment of pre-petition debts | 191,261 | 1,326,816 |
| Decrease in bank overdraft | 40,610 | – |
| Increase in cash | 1,460,115 | 124,138 |
| | $2,889,869 | 2,209,310 |

See accompanying summary of significant accounting policies and notes to financial statements.

SAN JUAN HOTEL CORPORATION

Accounting Policies

May 31, 1982 and 1981

A summary of significant accounting policies followed by San Juan Hotel Corporation (S.J.H.) is set forth below:

Petition for Reorganization

On May 20, 1980 the S.J.H. filed a petition for reorganization under Chapter 11 of the Federal Bankruptcy Code in the United States Bankruptcy Court for the District of Puerto Rico, caused primarily by the heavy losses it sustained, prior to the date of filing. On July 10, 1980 the Bankruptcy Court, entered an order appointing an operating trustee to operate the hotel

facilities, including authorization to incur expenses and obligations necessary to continue operations. This operational authority, encompassed the right of the Trustee to pay current expenses incurred after the petition was filed; the right to continue compensating its employees at the same rate in effect on the filing date of the petition; the right to buy and sell services for cash or credit, and the right to enter into contracts incidental to the normal and usual operations of business. Upon the filing of the petition the Corporation was required to close its books of accounts as of the date of the petition and to maintain new books of accounts showing all earnings, expenses, receipts and disbursements subsequent to the petition date and file with the Court a monthly statement of cash receipt and disbursements in order to disclose increases or decreases in cash or other liquid assets.

Chapter 11 is designed to rehabilitate a debtor by allowing it to reach an agreement with a majority of its creditors for a settlement of unsecured claims, which will be binding on all creditors. A plan of reorganization, if accepted by creditors holding at least two thirds in amount and more than one-half in number of the allowed claims and confirmed by the Court, may settle claims by immediate or deferred payment of the claims over an extended period.

Under certain circumstances, a Chapter 11 reorganization proceeding may be converted to straight bankruptcy. In contrast to Chapter 11, straight bankruptcy contemplates liquidation rather than a rehabilitation of the Debtor. Shareholders are entitled to share only in any liquidation proceeds remaining after all creditors have been paid in full.

## Going Concern Basis

The financial statements have been prepared on a going concern basis, which contemplated continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business, and do not give effect to any adjustment that may result from a final plan of reorganization resulting from the bankruptcy proceedings.

## Accounting Under Chapter 11 Reorganization Proceeding

S.J.H. owns and operates the facilities of El San Juan Hotel, at Isla Verde, Puerto Rico, a 415 rooms luxury hotel resort with restaurants, bars, casino, conventions and stores facilities and, under the protection of the Court, follows the accounting and reporting policies indicated below:

### Recorded Claims

Claims, herein after called collectively "Pre-petition Debts" include among others, secured debts and related accrued interest, trade accounts and notes payable, accrued liabilities and other liabilities as of the date of the filing of the Chapter 11 petition. Those debts incurred after the petition date are presented as "Post-petition Debts".

### Interest

The obligation of S.J.H. under the Chapter 11 to pay or accrue interest on unsecured pre-petition debts is determined by operations of law. S.J.H. based on advice of counsel, has not accrued any interest on such unsecured debts, since the date of the filing of its Chapter 11 petition.

### Casino Operation

In accordance with the industry practice, gaming at the casino is conducted on a credit as well as a cash basis under policies and procedures established by management. For financial statements purposes, IOU's and returned checks resulting from the casino operation are recorded as assets at their net realizable value.

### Inventories

Inventories of food and beverages and supplies are stated at the lower of cost, first-in, first-out basis, or market.

Property and Equipment

Property and equipment is stated at cost. Major renewals and betterments are charged to the property accounts while replacements, maintenance and repairs which do not improve or extend the life of the respective asset are expensed currently. Depreciation is provided on a straightline basis over the estimated useful lives of each type of depreciable asset. Lives used are as follows:

| | |
|---|---|
| Buildings | 40 years |
| Furniture and equipment | 10 years |

SAN JUAN HOTEL CORPORATION

Notes to Financial Statements

May 31, 1982 and 1981

(1) Cash

As of May 31, the cash balance consists of the following:

| | 1982 | 1981 |
|---|---|---|
| House bank | $172,897 | 126,275 |
| Certificate of deposit | 1,300,000 | - |
| New York Office-Petty Cash | 150 | 150 |
| Bank current accounts: | | |
| Banco Central | 57,112 | - |
| Sterling Bank – New York | 11,925 | 35,831 |
| The Royal Bank of Canada-Venezuela | 1,442 | 1,000 |
| The Royal Bank of Canada-Puerto Rico | 11 | 1,000 |
| Banco de Ponce – Operating | 75,842 | - |
| Banco de Ponce – New York | 3,492 | - |
| Other | 1,500 | - |
| | $1,624,371 | 164,256 |

(2) Receivables

As of May 31, receivables consist of the following:

| | 1982 | 1981 |
|---|---|---|
| Casino IOU's and returned checks | $1,000,091 | 947,810 |
| Travel agents | 82,161 | 127,478 |
| City ledger | 531,986 | 884,674 |
| Guest ledger | 62,710 | 119,702 |
| Store and concessions | 37,007 | 58,985 |
| Slot machines | - | 52,875 |
| Other | 27,703 | 75,800 |
| | $1,741,658 | 2,267,324 |

Allowances for doubtful accounts balances as of May 31, is segregated as as follows:

| | 1982 | 1981 |
|---|---|---|
| For casino IOU's and returned checks $ | 614,966 | 449,142 |
| For other receivables | 386,048 | 694,166 |
| | $1,001,014 | 1,143,308 |

For financial statements purposes the Company wrote-off as uncollectible $3,973,000 and $3,704,000 in 1982 and 1981, respectively, of city ledger receivables, casino IOU's and returned checks against the allowance for doubtful receivables. The accounts written-off secure the loan payable to Banco Popular de Puerto Rico as explained in note 7.

3) Inventories

As of May 31, inventories consist of the following:

| | 1982 | 1981 |
|---|---|---|
| Food | $ 80,898 | 139,239 |
| Beverage | 75,096 | 86,451 |
| Supplies | 130,361 | 142,372 |
| | $286,355 | 368,062 |

(4) Prepaid Expenses and Deposits

Prepaid expenses and deposits consists of the following:

| | 1982 | 1981 |
|---|---|---|
| Insurance | $ 82,030 | 98,099 |
| Licenses | 14,366 | 15,344 |
| Adequate protection deposits | 37,273 | 57,690 |
| Purchase and service deposits | 133,698 | 72,302 |
| Escrow deposit – Connecticut General Life (note 7) | 160,000 | 160,000 |
| Others | 8,579 | 9,024 |
| | $435,946 | 412,459 |

(5) Investment in and Advances to Subsidiaries

The Company has three wholly-owned subsidiaries:

El San Juan Hotel Corporation of New York
Caribbean Supplies, Inc.
El Conquistador Hotel Corporation

Since previous to 1977, all of the subsidiaries ceased operations and the Company wrote-off its investments in them. In 1980 the main asset of El Conquistador Hotel Corporation, the hotel facilities at Fajardo, Puerto Rico were foreclosed by Connecticut General Life Insurance Company who had a first mortgage on the property.

(6) Post-Petition Debts

Post-petition debts consists of the following:

| | 1982 | 1981 |
|---|---|---|
| Bank overdraft | 841 | 41,451 |
| Accounts Payable – Trade (Outstanding payables for purchases and expenses in the normal course of business incurred from the date of petition on.) | 2,345,401 | 735,207 |
| Accrued expenses and other liabilities: | | |
| Salaries and wages | 83,488 | 108,237 |
| Gratifications to employees | 23,034 | 65,293 |
| Vacations | 267,046 | 272,640 |
| Payroll taxes and withholdings | 109,999 | 327,272 |
| Utilities expenses | 53,685 | 26,724 |
| Interest – Connecticut General Life Insurance | 1,407,569 | 253,305 |
| Other accruals and liabilities | 129,233 | 128,606 |
| Advance deposits | 97,663 | 218,178 |
| | 2,171,717 | 1,400,255 |
| Total post-petition debts | $4,517,959 | 2,176,913 |

**(7) Secured Debts**

Secured debts consists of creditors having a security whose claims do not exceed the value of their security and as of May 31, consist of the following:

- **Connecticut General Life Insurance Company (Connecticut)**

 5% through March 31, 1981 and 8% thenafter first mortgage note guaranteed by Hotel land and buildings, principal and interest payable annually in four monthly installments of $260,835, through May 1, 1981 and of $330,871 through 2001 at which time the remaining balance is to be paid.

 In accordance with a stipulation signed on January 7, 1981, with Connecticut, unpaid debt service for 1980 was scheduled to be paid as follows:

 | Due Date | Amount |
 |----------|--------|
 | April 1, 1981 | $208,726.48 |
 | April 1, 1982 | 417,343.66 |
 | April 1, 1983 | 417,343.66 |

 The stipulation also provides for a monthly cash deposit of $40,000 to cover for property taxes.

 Outstanding debt with Connecticut as of May 31, is presented as follows:

 | | 1982 | 1981 |
 |---|------|------|
 | **Post-petition:** | | |
 | Accrued interest payable | $ 1,407,569 | 253,305 |
 | **Secured:** | | |
 | Principal | 13,251,552 | 13,351,552 |
 | Accrued interest payable | 638,141 | 638,141 |
 | | 13,889,693 | 13,989,693 |
 | | $15,297,262 | 14,242,998 |

 During 1982 SJH has not complied with the payment stipulation with Connecticut.

- **Banco Popular de Puerto Rico**

 4% second mortgage note guaranteed by Hotel land and buildings and a life insurance policy of $2,000,000 on the Company's major stockholder. Principal and interest was to be payable annually in four installment on the first day of January, February, March and April each year of $96,202 through 2001.

 No payment have been made for principal or interest after May 20, 1980 no interest have been accrued after that date.

 Outstanding debt with Banco Popular as of May 31, 1982 and 1981 is presented as follows:

 | Secured: | |
 |----------|---|
 | Principal | $5,554,103 |
 | Accrued interest payable | 475,019 |
 | | $6,029,122 |

- **Banco Popular de Puerto Rico**

 12% note payable secured by the Company's trade accounts receivable, the casino IOU's and returned checks outstanding as of March 31, 1980, which were written-off as uncollectible in 1981.

Since May 20, 1980 the principal balance has been affected as follows:

| | 1982 | 1981 |
|---|---|---|
| Balance May 20, 1980 | $1,254,999 | 1,254,999 |
| Less: | | |
| Application of subsequent collection for accounts pledged | 261,509 | 176,047 |
| Balances of current bank account as of May 20, 1980 applied to principal | 84,111 | 84,111 |
| Balance May 31, 1981 - Secured | $ 909,379 | 994,841 |

- GTE Sylvania, Inc.

 15.35% note payable secured with a conditional sale contract on television sets.

 The contracts provides for payment of principal and interest as follows:

 o sixteen payments of $7,508 each, due on January 1, through April 1, 1982, 1983 and 1984
 o and forty payments of $100 each, due on May 1, through December 1980 through 1984.

| | Principal | Deferred Interest | Total |
|---|---|---|---|
| Balance May 20, 1980 | $109,700 | 52,287 | 161,987 |
| Payments 1980-1981 | 20,005 | 21,906 | 41,911 |
| Balance May 31, 1981 - Secured | 89,695 | 30,381 | 120,076 |
| Payments 1981-1982 | -- | 4,176 | 4,176 |
| Capitalized Interest | 7,574 | (7,574) | -- |
| Balance May 31, 1982 - Secured | $ 97,269 | 18,631 | 115,900 |

Summary of secured debts as of May 31 follows:

| | 1982 | 1981 |
|---|---|---|
| Connecticut General Life Insurance Co. | $13,889,693 | 13,989,693 |
| Banco Popular de Puerto Rico: | | |
| Mortgage note | 6,029,122 | 6,029,122 |
| Note payable | 909,379 | 994,841 |
| GTE Sylvania, Inc. | 97,269 | 89,695 |
| | $20,925,463 | 21,103,351 |

 Under Chapter 11 the secured classification of the debts payable to Connecticut General Life Insurance Company and Banco Popular de Puerto Rico is contingent to the appraisal value of the property. The total secured debt could not exceed the appraised value of the property as determined by an appraisal report acceptable to the Court.

(8) Priority Debts

 Priority debts include unpaid compensation to employees, and benefits plan and payroll taxes for services rendered within 180 days before the filing of the petition, taxes owing to the United States, the Commonwealth of Puerto Rico or any state or other taxing authorities within the limitation provided by the Code. Amounts are detailed as follows:

| Commonwealth of Puerto Rico: | |
|---|---|
| As resulted from an agreement dated December 2, 1981: | |
| Personal property taxes 1970-1976 | $ 878,504 |
| Real property taxes 1969-1976 | 2,870,981 |
| Income tax withheld | 3,719,707 |
| Room tax | 1,004,600 |
| | 8,473,792 |

Others:
| | |
|---|---|
| State Unemployment Insurance | 400,553 |
| Workmen Compensation Insurance | 372,420 |
| Miscellaneous | 3,462 |
| Total to the Commonwealth of Puerto Rico | 9,250,227 |
| Internal Revenue Service - FICA withholding taxes and FUTA taxes | 401,103 |
| New York State - State and City withholdings taxes | 62,429 |
| Employee benefits plans | 88,342 |
| Vacations | 29,951 |
| Other miscellaneous | 52,618 |
| | $9,884,670 |

The agreement with the Commonwealth of Puerto Rico requires the payment of $300,000 in six equal installments, commencing on December 31, 1981 and 1982, $500,000 each year then after commencing on December 31, 1983. In addition, S.J.H. agreed to assign the total income derived from the operation of slot machines after December 31, 1981.

(9) **Unsecured Debts**

Unsecured debts as of May 31, 1982 consist of the following:

● Loan

Tourism Development Company:
5% note, originally to be paid solely out of 13%
of the net proceeds from the casino slot machine
remaining after the satisfaction of certain taxes
owed to the Commonwealth of Puerto Rico
Principal and interest ........................ $ 1,954,864

Puerto Rico Industrial Development Company:
5% note, originally to be paid solely out of
12% of the net proceeds of the casino slot
machines remaining after the satisfaction of
certain taxes owed to the Commonwealth of
Puerto Rico
Principal and interest ........................ 1,889,484

Notes to related parties:
Puerto Rico Hotel Corporation -
9% to 10% notes - Principal and interest ...... 2,589,767

New Mc Leary Condominium Corp.
Principal and interest ........................ 370,813

PFZ Corp.
Principal and interest ........................ 821,296

Chateau Rennaissence Corp.
Principal and interest ........................ 579,520

Other loans - Principal and interest .......... 138,037

Total loans ................................ 8,343,781

● Commonwealth of Puerto Rico - Workmen
Compensations Insurance ..................... 316,395

● Other payables and claims:

| Employee benefit | $ 428,583 |
|---|---|
| Due to related parties | 305,489 |

| | |
|---|---:|
| Due to Louis Puro - Stockholder | 636,930 |
| Accounts payable and other claims | 2,315,502 |
| | 3,686,504 |
| Total unsecured debts | $12,346,680 |

### (10) Priority and Unsecured Debts Payments

In order to maintain the current operation of the hotel, the Company decided to honor or make certain payments during the period from May 20, 1980 through May 31, 1982 corresponding to pre-petition balances. The payments are summarized as follows:

| | Total | Priority | Unsecured |
|---|---:|---:|---:|
| Compensation to employees | $208,224 | 208,224 | – |
| Advance deposits | 310,617 | 25,000 | 285,617 |
| Accounts payable | 102,816 | – | 102,816 |
| Insurance | 32,391 | – | 32,391 |
| Other | 17,507 | 10,763 | 6,744 |
| | $671,555 | 243,987 | 427,568 |

### (11) Puerto Rico Income Taxes

An income tax deficiency for the years 1969 through 1972 was cancelled by the Treasury Department. The Company signed a waiver extending the expiration of the period for review. Subsequent years have not been reviewed.

### (12) Tax Exemption Grant

On June 18, 1982, the Company was granted by the Commonwealth of Puerto Rico a tax exemption from the payment of property and municipal taxes on the hotel operation (excluding casino) as follows:

- Under Act No. 57 of June 13, 1963 as amended by Ad.No. 6 of November 20, 1975:

 A 100% exemption for a five-year period retroactively commencing on November 1, 1976 and ending on October 31, 1981

- Under Act No. 26 of June 2, 1978:

 A 75% exemption for a five-year period retroactively commencing on November 1, 1981 and ending on October 31, 1986.

The exemption grant includes various restricted convenances which among other requires the Company's compliance with a payment agreement for various taxes liabilities as described in note 8 to these statements. Failure to comply with the agreement could result in a retroactive cancellation of the Grant.

As a result of the tax exemption grant, the Company saved approximately $3,300,000 in property taxes and interest corresponding to the period covered under the retroactive effect of the Grant. Out of such amount, only approximately $800,000 were recorded by the Company as of May 31, 1981, accordingly a retroactive adjustment to the financial statements of 1981 was made to give effect to the elimination of the originally recorded amount.

### (13) Capital Stock

The Series C - 7% cumulative prior preferred stock is convertible into common stock at the rate of 100 shares of common stock for each share of series C stock. The Company has the right to redeem this stock at any time. The holders of the series C stock are entitled to participate in any dividend to be declared on the common stock to the same extent as if they held the number of shares of common stock into which said stock

is convertible. The stock is also entitled to first priority in the event of dissolution or the company distribution of its net assets to the common stockholders.

As of May 31, 1982 and 1981, cumulative dividends of approximately $2,517,000 and $2,406,000 on the 6% series A and B preferred stock, $318,000 and $304,000, on the series C - 8% prior preferred stock, respectively, are in arrears (exclusive of shares held in treasury).

(14) Capital Stock Held in Treasury

Stock held in treasury is stated at cost and consists of the following at May 31:

| | |
|---|---|
| Common stock - 211,051 shares | $ 227,709 |
| Preferred stock: | |
| Series B - 8,886 shares | 959,724 |
| Series C - 927 shares | 104,034 |
| | $1,291,467 |

(15) Cost of Sales and Expenses

Cost of sales and expenses pertaining to the various operating departments are summarized as follows for the period ended May 31:

| | 1982 | 1981 |
|---|---|---|
| Cost of sales: | | |
| Food | $ 1,099,831 | 1,200,500 |
| Beverage | 558,559 | 434,010 |
| Telephone | 255,900 | 238,064 |
| Others | 4,425 | 3,771 |
| | 1,918,715 | 1,876,345 |

(Balance forward)

| | 1982 | 1981 |
|---|---|---|
| Payroll and related expenses: | | |
| Rooms | 1,291,173 | 1,169,306 |
| Food | 2,045,474 | 1,983,227 |
| Beverage | 583,471 | 663,972 |
| Telephone | 79,118 | 76,909 |
| Casino | 2,304,732 | 2,908,204 |
| Others | 129,945 | 116,888 |
| | 6,433,913 | 6,918,506 |
| Other operating expenses: | | |
| Rooms | 517,607 | 449,448 |
| Food | 355,263 | 442,882 |
| Beverage | 257,743 | 266,937 |
| Telephone | 884 | 2,353 |
| Casino | 1,936,476 | 3,324,677 |
| Others | 994,837 | 1,665,614 |
| | $12,415,438 | 14,946,762 |

(16) Pension Plan

The Company is required to contribute to two pension plans covering unionized personnel as required by the union contracts. During the period ended May 31, 1982 and 1981 the pension plan expense was $77,000 and $61,000, respectively. The Local 610 plan (which is the largest) requires twenty years (20) of service for vesting benefits. The trustee of the plan stated that the actuaries had reported that the plan's future liabilities do not exceed its present assets and projected income.

(17) Contingencies

Certain claims, suits and complaints arising in the ordinary course of business and others related to the Chapter 11 proceedings have been filed against the Company. In the opinion of the Trustee all such matters are adequately covered by insurance or if not so covered, are without merit or are of such kind, or involved such amount, as would not have a significant effect on the financial position or results of operations of the Company is disposed unfavorably. Those related to the Chapter 11 proceedings, the Court have issued order of stay persuant to Section 362 of the Bankruptcy Code.

(18) Reclassifications

Certain reclassifications have been made to the 1981 financial statements to conforms to the presentation in 1982.

---

## ADDENDUM B

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF PUERTO RICO

### APPLICATION FOR FINAL COMPENSATION

TO THE HONORABLE ANTONIO I. HERNANDEZ–RODRIGUEZ:

Comes now Héctor M. Rodríguez-Estrada and very respectfully submits his final application for compensation as 11 U.S.C. Chapter 11 and Chapter 7 Trustee of Debtor and as grounds therefor shows:

1. On July 10, 1980, applicant was appointed by this Court as Operating Trustee of San Juan Hotel Corporation ("SJH") in said Debtor's Chapter 11 proceedings. Applicant performed as such, since the date of his appointment until March 24, 1983, on which date SJH's Chapter 11 reorganization proceedings were converted to Chapter 7 liquidation proceedings.

2. Notwithstanding the order of conversion, the appearing party was authorized to continue SJH's hotel operations until March 31, 1983. However, on March 26, 1983, said operations were discontinued.

3. On September 21, 1983, Hans López Stubbe was elected by SJH's creditors as said Debtor's Chapter 7 Trustee. Thereafter, on September 23, 1983, an order was issued appointing Mr. Lopez Stubbe as such. Hence, on this latter date Mr. López Stubbe became SJH's Chapter 7 Trustee and applicant was substituted as Debtor's Chapter 7 Interim Trustee.

4. The appearing party performed as SJH's Chapter 11 Operating Trustee from July 10 1980 to March 24, 1983, and as its Chapter 7 Interim Trustee from March 24, 1983 to September 23, 1983.

5. During his incumbency as Chapter 11 Operating Trustee, applicant performed as debtor's chief operating officer in substitution of the chairman of the board, president, vice-president of operations and other executives.

The performance by applicant of his duties and responsibilities as Chapter 11 Operating Trustee resulted in the reduction of overhead expenses, the consolidation of

administrative positions, reduction in work force, without any effect on the services to guests, all of which was to the benefit of the estate

As Chapter 11 Operating Trustee applicant was responsible for the establishment of appropriate working capital levels in order to assure an efficient operation. He was instrumental in obtaining financing agreements with the mortgage holders, Connecticut General Life Insurance Company and in efficiently dealing with labor unions in order to obtain reduction of expenses in the operation of Debtor's hotel. In addition, he was responsible for the implementation of accounting systems and controls and established any new management team and savings policies.

6. As Chapter 7 Interim Trustee he collected and reduced to money that property of the estate which could be realized and both as Chapter 11 Operating Trustee and Chapter 7 Interim Trustee made a final report and submitted a final account of his administration.

7. As it appears from applicant's final reports as Debtor's Chapter 11 Operating Trustee and Chapter 7 Interim Trustee, filed with this Court on November 1, 1983, and which have not been questioned by any party, during applicant's incumbency his disbursements as SJH's Chapter 11 and Chapter 7 Trustee were as follows:

 a. Chapter 11 from July 10, 1980—March 24, 1983—$45,598,493.00.

 b. Chapter 7 from March 25, 1983—September 23, 1983—$524,045.00.

8. Through its order of July 24, 1980, this Court fixed applicant's compensation as $750.00 per week, plus expenses incurred in the performance of his duties. Said order authorized applicant to draw said compensation on a weekly basis, beginning with the week following his appointment.

9. The order of July 24, 1980, provided that the same was "a provisional allowance chargeable to the trustee's ultimate fee and subject to review, same being fixed provisionally, as obviously the trustee merits present compensation be paid even though the amount of his final allowance can not now be determined."

10. The allowance provided by the order of July 24, 1980, was not reviewed at any time during applicant's incumbency as SJH's Chapter 11 or Chapter 7 Interim Trustee.

11. The version of Section 326(a) of the Bankruptcy Code applicable to this case provides as follows:

"(a) In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed fifteen percent on the first $1,000 or less, six percent on any amount in excess of $1,000 but not in excess of $3,000, three percent on any amount in excess of $3,000 but not in excess of $20,000, two percent on any amount in excess of $20,000 but not in excess of $50,000, and one percent on any amount in excess of $50,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims."

12. Considering the amounts disbursed by applicant as SJH's Chapter 11 Operating Trustee and Chapter 7 Interim Trustee, the total compensation to be awarded to him is as follows:

| a. | Chapter 11 | |
|---|---|---|
| | From $1.00 to $1,000.00 | $150.00 |
| | From $1,001.00 to $3,000.00 | 120.00 |
| | From $3,001.00 to $20,000.00 | 510.0 |
| | From $20,001.00 to $50,000.00 | 600.00 |
| | From $50,001.00 to | |
| | $45,598,493.00 | 455,485.00 |
| | TOTAL | $456,865.00 |
| b. | Chapter 7 | |
| | From $1.00 to $1,000.00 | $150.00 |
| | From $1,001.00 to $3,000.00 | 120.00 |
| | From $3,001.00 to $20,000.00 | 510.00 |
| | From $20,001.00 to $50,000.00 | 600.00 |
| | From $50,001.00 to $524,045.00 | 4,740.00 |
| | TOTAL | $6,120.00 |
| | SUB–TOTAL | $462,985.00 |

13. As Chapter 11 and Chapter 7 Trustee, applicant received the following advances:

a. Chapter 11

| | |
|---|---:|
| Compensation | 106,500.00 |
| Expenses | 42,600.00 |
| TOTAL | 149,100.00 |

b. Chapter 7

| | |
|---|---:|
| Compensation | 0 |
| Expenses | 0 |
| TOTAL | 0 |

14. If we deduct the advances received by applicant during his incumbency ($149,100.00), from the total compensation to which he is entitled, there is a balance due applicant of $313,885.00.

15. 11 U.S.C. § 330 relative to the compensation of officers, provides that after notice and a hearing, and subject to 11 U.S.C. §§ 326, 328 and 329, the court may award to a trustee:

"(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses."

16. During his incumbency as Debtor's Chapter 11 Operating Trustee and Chapter 7 Interim Trustee, applicant performed all services relative to his incumbency, all of which were actual, necessary services rendered by him and considering the nature, the extent and the value thereof, the time spent in performing them, and the cost of comparable services other than in a case under 11 U.S.C., he is entitled to the final compensation set forth in paragraph 12 hereof, which after deducting the amounts specified in paragraph 13 hereof, leaves a net amount due to him of $313,885.00.

17. All the services performed by applicant as Debtor's Chapter 11 Operating Trustee and Chapter 7 Interim Trustee and for which compensation is sought were performed in connection with the instant case and were not services in any other matter.

18. There are no agreements on the part of applicant for sharing any of the compensation received or to be received.

WHEREFORE, applicant prays that he be allowed the sum of $313,885.00, as and for final compensation for his services.

Ponce, Puerto Rico, this 10th day of June, 1986.

/s/ Hector M. Rodriguez-Estrada
HECTOR M. RODRIGUEZ–ESTRADA
Applicant
P.O. Box 20577
Río Piedras, Puerto Rico 00928
Tel. 760–6177

### UNSWORN DECLARATION UNDER PENALTY OF PERJURY

The undersigned certifies under penalty of perjury that he has read the foregoing application by him subscribed, and that the facts set forth therein are true to the best of his knowledge and belief.

/s/ Hector M. Rodriguez-Estrada
HECTOR M. RODRIGUEZ–ESTRADA

CERTIFICATE OF SERVICE: It is hereby certified that a true and exact copy of the preceding document was forwarded on this same date and by regular mail to Rodrigo Otero Bigles, Esq., P.O. Box 1935, Hato Rey, Puerto Rico, 00919; and to the members of the Creditors' Committee as per attached list.

Ponce, Puerto Rico, this 10th day of June, 1986.

/s/ Hector M. Rodriguez-Estrada
HECTOR M. RODRIGUEZ–ESTRADA
Applicant
P.O. Box 20577
Río Piedras, Puerto Rico 00928
Tel. 760–6177
José González Irizarry, Esq.
G.P.O. Box 4225
San Juan, Puerto Rico 00936
José Luis Novas-Dueño, Esq.
1130 Banco Popular Center
Hato Rey, Puerto Rico 00918
Abelardo Ruiz-Suria, Esq.
G.P.O. Box 4225
San Juan, Puerto Rico 00936
P.R. Energy & Power Authority
G.P.O. Box 4267

San Juan, Puerto Rico 00936
IBM Corporation
G.P.O. Box 4387
San Juan, Puerto Rico 00936
Gastronomical Workers Union
Local 610
P.O. Box FG
Santurce, Puerto Rico 00910
Temple Beef Co.
452 West 13th. Street
New York, New York 10014
Barry Packing Co., Inc.
449 West 13th. Street
New York, New York 10014
Equitable Life Ins. Co.
P.O. Box 1450
Church Street Station
New York, New York 10008
RCA
Box 9328
Church Street Station
New York, New York 10249
Mr. Michael S. Maram
Acting Regional Director
National Labor Relations Board
Region # 24
Federico Degetau Federal Building
Room # 591
Carlos Chardón Avenue
Hato Rey, Puerto Rico 00918
Francisco A. Besosa, Esq.
Assistant U.S. Attorney
Room 101—Federal Building
Chardón Avenue
Hato Rey, Puerto Rico 00918